IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

ALLIANCE OF AUTOMOTIVE SERVICE PROVIDERS, INC.,
JUNIPER AUTO BODY, INC.,
L.I.P. COLLISION, INC.,
TOTAL PERFORMANCE AUTOMOTIVE, LLC,
ALAN'S AUTO CENTER & LEASING CORP.,
PROFESSIONAL, INC.,                                      3:14-cv-237
NIGRO'S AUTO BODY, INC.,
OPEKA AUTO REPAIR CO., INC.,
KILKEARY'S AUTO BODY, INC.,
HAYES AUTO BODY, INC.,

                           **PLAINTIFFS**

VS.


STATE FARM MUTUAL AUTO INSURANCE COMPANY,
STATE FARM FIRE AND CASUALTY COMPANY,
ALL STATE FIRE AND CASUALTY INSURANCE COMPANY,
ALL STATE INSURANCE COMPANY,
ALL STATE INDEMNITY COMPANY,
ALL STATE NORTHBROOK INDEMNITY COMPANY,
ALL STATE PROPERTY AND CASUALTY INSURANCE COMPANY,
ALL STATE VEHICLE AND PROPERTY INSURANCE COMPANY,
NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY,
NATIONWIDE MUTUAL INSURANCE COMPANY,
NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,
NATIONWIDE GENERAL INSURANCE COMPANY,
NATIONWIDE AFFINITY INSURANCE COMPANY OF AMERICA,
NATIONWIDE INSURANCE COMPANY OF AMERICA,
PROGRESSIVE SPECIALTY INSURANCE COMPANY,
PROGRESSIVE ADVANCED INSURANCE COMPANY,
PROGRESSIVE PREFERRED INSURANCE COMPANY,
PROGRESSIVE DIRECT INSURANCE COMPANY,
PROGRESSIVE NORTHERN INSURANCE COMPANY,
TRAVELERS HOME AND MARINE INSURANCE COMPANY (THE),
TRAVCO INSURANCE COMPANY,
TRAVELERS PERSONAL INSURANCE COMPANY,
TRAVELERS PERSONAL SECURITY INSURANCE COMPANY,
TRAVELERS INDEMNITY INSURANCE COMPANY OF CONNECTICUT (THE),
TRAVELERS INDEMNITY COMPANY (THE),
TRAVELERS CASUALTY COMPANY OF CONNECTICUT,

**TRAVELERS PROPERTY CASUALTY INSURANCE COMPANY,**    3:14-cv-237
**TRAVELERS COMMERCIAL INSURANCE COMPANY,**
**GEICO GENERAL INSURANCE COMPANY,**
**GEICO CASUALTY COMPANY,**
**GEICO INDEMNITY COMPANY,**
**GOVERNMENT EMPLOYEES INSURANCE COMPANY,**
**PROGRESSIVE CASUALTY INSURANCE COMPANY,**
**LIBERTY INSURANCE CORPORATION,**
**UNITED SERVICES AUTOMOBILE ASSOCIATION,**
**USAA CASUALTY INSURANCE COMPANY,**
**USA GENERAL INDEMNITY COMPANY,**
**LM GENERAL INSURANCE COMPANY,**
**FIRST LIBERTY MUTUAL FIRE INSURANCE COMPANY,**
**AAA MID ATLANTIC INSURANCE COMPANY,**
**PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY,**
**DONEGAL MUTUAL INSURANCE COMPANY,**
**ENCOMPASS HOME AND AUTO INSURANCE COMPANY,**
**ENCOMPASS INSURANCE COMPANY OF AMERICA,**
**ENCOMPASS INDEMNITY COMPANY,**
**ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY,**
**ESURANCE INSURANCE COMPANY,**
**HARLEYSVILLE PREFERRED INSURANCE COMPANY,**
**HORACE MANN PROPERTY AND CASUALTY INSURANCE COMPANY,**
**HORACE MANN INSURANCE COMPANY,**
**STATE AUTO PROPERTY AND CASUALTY COMPANY,**
**STATE AUTOMOBILE MUTUAL INSURANCE COMPANY,**
**PROPERTY AND CASUALTY INSURANCE COMPANY OF HARTFORD,**
**HARTFORD INSURANCE COMPANY OF THE SOUTHEAST,**
**HARTFORD INSURANCE COMPANY OF THE MIDWEST,**
**HARTFORD UNDERWRITERS INSURANCE COMPANY,**
**HARTFORD INSURANCE COMPANY OF ILLINOIS,**
**HARTFORD CASUALTY INSURANCE COMPANY,**
**HARTFORD ACCIDENT AND INDEMNITY COMPANY,**
**HARTFORD FIRE INSURANCE COMPANY,**
**FARMERS NEW CENTURY INSURANCE COMPANY,**
**FARMERS FIRE INSURANCE COMPANY,**
**KEMPER INDEPENDENCE INSURANCE COMPANY,**
**SAFECO INSURANCE COMPANY OF AMERICA,**
**SAFECO INSURANCE COMPANY OF ILLINOIS,**
**SAFECO INSURANCE COMPANY OF INDIANA,**

                                        **DEFENDANTS**

**COMPLAINT**                                              3:14-cv-237

**JURY TRIAL DEMANDED**

**TO THE HONORABLE, THE JUDGES OF SAID COURT:**

   **AND NOW,** come the above captioned Plaintiffs pursuant to the Federal Rules of

Civil Procedure and other applicable authority and file this**,** their **COMPLAINT** against the

above named Defendants and in accordance thereof state as follows:

  Where the term "Defendants" is used within this Complaint, "Defendants" is intended to

and does mean each and every Defendant named in the caption above.

**PARTIES**

  1.  Plaintiff, Alliance of Automotive Service Providers, Inc., is a Pennsylvania

corporation licensed to do business and is doing business at 2151 Greenwood Street, Harrisburg,

PA 17104.

  2.  Plaintiff, Juniper Auto Body, Inc. is a Pennsylvania corporation licensed to do

business and is doing business at 1116 N. West End Boulevard, Quakertown, PA  18951.

  3.  Plaintiff, L.I.P. Collision, Inc. is a  Pennsylvania corporation licensed to do

business and is doing business at 320 Elm Avenue, North Wales, PA 19454.

  4.  Plaintiff, Total Performance Automotive, LLC is a Pennsylvania limited liability

company register to do business and is doing business at 283 N. Main Street, Ambler, PA 19002.

  5.  Plaintiff, Alan's Auto Center & Leasing Corp. d/b/a Alan's Collision Centre, is a

Pennsylvania corporation licensed to do business and is doing business at 601 Red Lion Road,

Philadelphia, PA 19115.

  6.  Plaintiff, Professional, Inc., d/b/a Professionals Auto Body, is a Pennsylvania

corporation licensed to do business and is doing business at 1109 Plank Road, Duncansville, PA

16635 and 419 E. Pleasant Valley Boulevard, Altoona, PA 16602.

7.      Plaintiff, Nigro's Auto Body, Inc. is a Pennsylvania corporation licensed to do business and is doing business at 939-41 Washington Avenue, Philadelphia, PA 19147.

8.      Plaintiff, Opeka Auto Repair Co., Inc. is a Pennsylvania corporation licensed to do business and is doing business at 440 Valley Brook Road, McMurray, PA 15317.

9.      Plaintiff, Kilkeary's Auto Body, Inc. is a Pennsylvania corporation licensed to do business and is doing business at 647 Thomas Road, Eighty Four, PA 15330.

10.     Plaintiff, Hayes Auto Body, Inc. is a Pennsylvania corporation licensed to do business and is doing business at 115 Schoolhouse Road, Souderton, PA 18964.

11.     Defendant, State Farm Mutual Auto Insurance Company is a mutual company registered with the Pennsylvania Insurance Department to do business within the state of Pennsylvania whose headquarters is located at One State Farm Plaza, Bloomington, IL 61710.

12.     Defendant, State Farm Fire and Casualty Company is an insurance company registered with the Pennsylvania Insurance Department to do business within the state of Pennsylvania whose headquarters is located at One State Farm Plaza, Bloomington, IL 61710.

13.     Defendant, Allstate Fire and Casualty Insurance Company is an insurance company registered to do business with the Pennsylvania Insurance Department with headquarters located at 2775 Sanders Road, Northbrook, IL 60062.

14.     Defendant, Allstate Insurance Company is an insurance company registered with the Pennsylvania Insurance Department to do business in Pennsylvania and is headquartered at 2775 Sanders Road, Northbrook, IL 60062.

15.     Defendant, Allstate Indemnity Company is an insurance company licensed to do business with the Pennsylvania Insurance Department whose corporate headquarters is located at

2775 Sanders Road, Northbrook, IL 60062.

16.     Defendant, Allstate Northbrook Indemnity Company is an insurance company licensed to do business with the Pennsylvania Insurance Department and whose corporate headquarters is located at 2775 Sanders Road, Northbrook, IL 60062.

17.     Defendant, Allstate Property and Casualty Insurance Company is an insurance company registered with the Pennsylvania Insurance Department to do business within the state of Pennsylvania and whose corporate headquarters is located at 2775 Sanders Road, Northbrook, IL 60062.

18.     Defendant, Allstate Vehicle and Property Insurance Company is an insurance company registered with the Pennsylvania Insurance Department to do business in Pennsylvania with corporate headquarters located at 2775 Sanders Road, Northbrook, IL 60062.

19.     Defendant, Nationwide Property and Casualty Insurance Company is an insurance company registered to do business with the Pennsylvania Insurance Department with headquarters located at One Nationwide Plaza, Columbus, OH 43216.

20.     Defendant, Nationwide Mutual Insurance Company is an insurance company registered with the Pennsylvania Insurance Department to do business and is doing business within the state of Pennsylvania with corporate headquarters located at One Nationwide Plaza, Columbus, OH 43216.

21.     Defendant, Nationwide Mutual Fire Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Nationwide Plaza, Columbus, OH 43216.

22.     Defendant, Nationwide General Insurance Company is an insurance company

registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Nationwide Plaza, Columbus, OH 43216.

23.     Defendant, Nationwide Affinity Insurance Company of America is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Nationwide Plaza, Columbus, OH 43216.

24.     Defendant, Nationwide Insurance Company of America is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 902 Ann Street, Suite A, Madison WI 53713.

25.     Defendant, Progressive Specialty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 6300 Wilson Mills Road, W33, Mayfield, Village, OH 44143.

26.     Defendant, Progressive Advanced Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 6300 Wilson Mills Road, W33, Mayfield, Village, OH 44143.

27.     Defendant, Progressive Preferred Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 6300 Wilson Mills Road, W33, Mayfield, Village, OH 44143.

28.     Defendant, Progressive Direct Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 6300 Wilson Mills Road, W33, Mayfield, Village, OH 44143.

29.     Defendant, Progressive Northern Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with a home address of c/o CT Corporation 8020 Excelsior Drive, Madison WI 53717.

30.     Defendant, Travelers Home and Marine Insurance Company (THE) is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

31.     Defendant, Travco Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06138.

32.     Defendant, Travelers Personal Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

33.     Defendant, Travelers Personal Security Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

34.     Defendant, Travelers Indemnity Insurance Company of Connecticut (THE) is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

35.     Defendant, Travelers Indemnity Company (THE) is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

36.     Defendant, Travelers Casualty Company of Connecticut is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

37.     Defendant, Travelers Property Casualty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

38.     Defendant, Travelers Commercial Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Tower Square, Hartford, CT 06183.

39.     Defendant, GEICO General Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 5260 Western Avenue, Chevy

Chase, MD 20076.

40.      Defendant, GEICO Casualty Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 5260 Western Avenue, Chevy Chase, MD 20076.

41.      Defendant, GEICO Indemnity Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 5260 Western Avenue, Chevy Chase, MD 20076.

42.      Defendant, Government Employees Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 5260 Western Avenue, Chevy Chase, MD 20076.

43.      Defendant, Progressive Casualty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 6300 Wilson Mills Road, W33 Mayfield Village, OH 44143.

44.      Defendant, First Liberty Insurance Corporation is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 2815 Forbs Avenue, Suite 200, Hoffman Estates, IL 60192.

45.      Defendant, United Services Automobile Association is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the

state of Pennsylvania with corporate headquarters located at 9800 Fredericksburg Road, San Antonio, TX 78288.

46.     Defendant, USAA Casualty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 9800 Fredericksburg Road, San Antonio, TX 78288.

47.     Defendant, USA General Indemnity Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 9800 Fredericksburg Road, San Antonio, TX 78288.

48.     Defendant, LM General Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 28154 Forbs Avenue, Suite 200, Hoffman Estates, IL 60192.

49.     Defendant, Liberty Mutual Fire Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 200 West Wood Drive, Wausau, WI 54401.

50.     Defendant, AAA Mid Atlantic Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 391 West Lancaster Avenue, Haverford, PA 19041.

51.     Defendant, Pennsylvania National Mutual Casualty Insurance Company is an

insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at Two N. Second Street, Harrisburg, PA 17101.

52.     Defendant, Donegal Mutual Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 1195 River Road, Marietta, PA 17547.

53.     Defendant, Encompass Home and Auto Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 2775 Sanders Road, Northbrook, IL 60062.

54.     Defendant, Encompass Insurance Company of America is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 2775 Sanders Road, Northbrook, IL 60062.

55.     Defendant, Encompass Indemnity Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 2775 Sanders Road, Northbrook, IL 60062.

56.     Defendant, Esurance Property and Casualty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Embarcardero Center, San Francisco, CA 94111.

57.     Defendant, Esurance Insurance Company is an insurance company registered to

business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at Ten East Doty Street, Suite 621, Madison, WI 53703.

58.     Defendant, Harleysville Preferred Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 355 Maple Avenue, Harleysville, PA 19438.

59.     Defendant, Horace Mann Property and Casualty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Horace Mann Plaza, Springfield, IL 62715.

60.     Defendant, Horace Mann Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Horace Mann Plaza, Springfield, IL 62715.

61.     Defendant, State Auto Property and Casualty Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 1300 Woodland Avenue, West Des Moines, IA 50265.

62.     Defendant, State Automobile Mutual Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 518 East Broad Street, Columbus, OH 43215.

63.     Defendant, Property and Casualty Insurance Company of Hartford is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 501 Pennsylvania Parkway, Suite 400, Indianapolis, IN 46280.

64.     Defendant, Hartford Insurance Company of the Southeast is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Hartford Plaza, Hartford, CT 06155.

65.     Defendant, Hartford Insurance Company of the Midwest is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 501 Pennsylvania Parkway, Suite 400, Indianapolis, IN 46280.

66.     Defendant, Hartford Underwriters Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Hartford Plaza, Hartford, CT 06155.

67.     Defendant, Hartford Insurance Company of Illinois is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 4525 Meridian Parkway, Aurora, IL 60504.

68.     Defendant, Hartford Casualty Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 501 Pennsylvania Parkway, Suite

400, Indianapolis, IN 46280.

69.     Defendant, Hartford Accident and Indemnity Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Hartford Plaza, Hartford, CT 06155.

70.     Defendant, Hartford Fire Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One Hartford Plaza, Hartford, CT 06155.

71.     Defendant, Farmers New Century Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 2245 Sequoia Drive, Aurora, IL 60506.

72.     Defendant, Farmers Fire Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 2875 Eastern Boulevard, York, PA 17402.

73.     Defendant, Kemper Independence Insurance Company is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at One East Wacker Drive, Chicago, IL 60601.

74.     Defendant, Safeco Insurance Company of America is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 62 Maple Avenue, Keene, NH 03431.

75.     Defendant, Safeco Insurance Company of Illinois is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 27201 Bella Vista Parkway, Suite 130, Warrenville, IL 60555.

76.     Defendant, Safeco Insurance Company of Indiana is an insurance company registered to business with the Pennsylvania Insurance Department and is doing business in the state of Pennsylvania with corporate headquarters located at 350 East 96th Street, Indianapolis, IN 46204.

## JURISDICTION AND VENUE

79.     Original jurisdiction and venue exists in this Court pursuant to 28 U.S.C. § 1331, as the Plaintiffs assert causes of action arising under the United States Constitution, and/or laws and treaties of the United States; and 28 U.S.C. § 1391(b)(2), as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim(s) occurred.

## FACTS

80.     Each individual Plaintiff is in the business of recovery and/or repair of motor vehicles involved in collisions.

81.     Each individual Defendant is an insurer providing automobile policies to consumers throughout the state of Pennsylvania.

82.     Each individual Plaintiff has done business at various times over the course of years with the Defendants' policyholders and claimants by providing to these policyholders and claimants motor vehicle collision repair service. Each Defendant is individually responsible for payment for those repairs for their respective policyholders and claimants.

83.    Over the course of several years, the Defendants have engaged in an ongoing, concerted and intentional course of action and conduct with State Farm acting as the spearhead to improperly and illegally control and depress automobile damage repair costs to the detriment of the Plaintiffs and the substantial profit of the Defendants.

84.    One of the methods by which the Defendants exert control over Plaintiffs' businesses is by way of entering program agreements with body shops. Although each Defendant's program agreement has a unique title, such agreements are known generally and generically within the collision repair industry as direct repair program agreements ("DRPs").

85.    DRPs were presented to body shops as a mutually beneficial opportunity. In exchange for providing certain concessions of price, priority and similar matters, the individual Defendants would list the body shop as a preferred provider.

86.    However, the concessions demanded by the individual Defendants in exchange for remaining on the direct repair program were not balanced by the purported benefits. The Defendants, particularly State Farm, have utilized these agreements to exert control over the Plaintiffs' businesses in a variety of manners, well beyond that of an ordinary business agreement, even when a Plaintiff was not a DRP shop.

87.    Defendants, particularly State Farm, have engaged in an ongoing pattern and practice of coercion and implied threats to the pecuniary health of the individual Plaintiff businesses in order to force compliance with unreasonable and onerous concessions. Failure to comply results in either removal from the program(s) combined with improper "steering" of customers away from the Plaintiff's business, or simply punishment to decrease the number of customers utilizing the Plaintiffs' services.

88.     According to the Company Market Share Report (attached as Exhibit 1), as of December 31, 2012, State Farm has captured 21.54% of the private passenger automobile insurance business within the market area of the state of Pennsylvania. The market share for its closest competitor, Erie Insurance Group/Exchange, is only approximately half of State Farm's market share at 11.82%. The next closest competitor, Allstate, likewise holds only approximately half of the market share of State Farm at 11.8% and is followed by Nationwide at 9.3% and Progressive at 8.01%.

89.     The remaining 279 companies which report earning premiums within the market area of the state of Pennsylvania for private passenger automobile insurance split the remaining 37.53% of the market with Geico and Travelers being the next largest market holders with less than 5% of the market each.  See copy of Company Market Share Report-2012 attached hereto as Exhibit "1."

90.     Based upon the most recent information available, it is clearly apparent State Farm holds the unchallenged dominant position within the automobile insurance industry in the Pennsylvania market.

91.     Collectively, the Defendants control over 70% of the market within the Commonwealth of Pennsylvania.

92.     The vast majority of the Plaintiffs' business is generated by customers for whom the Defendants are responsible to pay repair costs.  The insurance-paying customers account for between seventy and ninety-five percent of each shop's revenue.   Overall, courts have acknowledged the significant role played by insurance companies in funding automobile collision repairs, as well as the ability and market power to exert substantial influence and control over where consumers will take a wrecked car for repairs. See, e.g., *Allstate Ins. Co. v.*

*Abbott*, 2006 U.S. Dist. LEXIS 9342 (N.D. Tex. 2006)(aff'd, *Allstate Ins. Co. v. Abbott*, 2007 U.S. App. LEXIS 18336 (5th Cir. 2007).

93.     As a general proposition, each DRP contains a general statement that the body shop will charge the respective insurance company no more for any particular repair than is the "market rate" in the market area.

94.     In order to establish the "market rate," State Farm utilizes what it terms "surveys."  The geographical boundaries of the market area to be "surveyed" to establish the "market rate" are wholly within the control and direction of State Farm.

95.     Under the terms of its DRP, State Farm is not required to disclose any of the methods by which it establishes the market area, the market rate, or any other factual bases for its determination of the "market rate." The agreement contains no provisions for independent and neutral verification of the data utilized, nor any oversight not directly within the control and direction of State Farm.   The shops are simply required to blindly accept State Farm's pronouncements regarding these matters including, again, shops which are not DRP shops.

96.     Previously this "survey" was conducted by sending written documents to the individual shops.  The owner or designated representative of the shop would fill out the survey and return it to State Farm. In recent years, this process has been transferred to an electronic forum, State Farm's Business to Business portal, whereby the shops go online to complete the "survey."

97.     State Farm does not perform a survey in the traditional sense, where information is obtained and results produced, establishing a baseline of all the shops' information.  With respect to labor rates, as an example, State Farm's methodology does not represent what the majority of shops in a given area charge, quite the contrary.  State Farm's methodology lists the

shops in a given market (as determined by State Farm) with the highest rates submitted at the top of the list and descending to the least expensive hourly rates at the bottom.

98.     State Farm then lists how many technicians a shop employs or the number of work bays available, whichever is lesser.  Those are then totaled and State Farm employs its "half plus one" method.  If, for example, a State-Farm-determined market area has a total of fifty (50) technicians or work bays, State Farm's "half plus one" math equals twenty six (26).  With that number, starting at the bottom of the shop list, State Farm counts each shops' technicians or work bays until the "half plus one" number is reached, twenty six in this example, and whatever that shop's rate happens to be is declared the market rate.

99.     There could, arguably, be some validity to this method, if it accounted for the variance in shop size, skill of technicians and other quality variables, which it does not. However, the greatest problem with this method is that State Farm can and does alter the labor rates input by the shops, decreasing those arbitrarily deemed too high–or higher than State Farm wishes to pay.

100.    By altering the rates entered, particularly those of the larger shops, those with the most technicians and/or work bays, State Farm manipulates the results to achieve a wholly artificial "market rate."   The results are therefore not that of an actual survey reflecting the designated market area but created from whole cloth by State Farm.

101.    Furthermore, State Farm attempts to prohibit the shops from discussing with each other the information each has entered into the survey, asserting any discussion may constitute illegal price fixing.  State Farm selects the geographical boundaries of the "survey," and State Farm retains the right to alter the "survey" results and does so.  The entire process is performed

without disclosure or oversight and State Farm does not publish or otherwise make publicly available its survey results or the "market rate" it selects.

102.   Another electronic page on State Farm's business portal is known as the Dashboard/Scorecard. An example of State Farm's Dashboard is attached hereto for descriptive purposes as Exhibit "2."

103.   The Dashboard has substantive impact on several levels.  It serves as the record of an individual shop's survey responses.   It also provides a "report card" and rating of the individual shop based primarily upon three criteria: quality, efficiency and competitiveness.

104.   Within the quality criterion, the shop's reported customer satisfaction, customer complaints, and quality issues identified by an audit are scored.

105.   The efficiency criterion evaluates repair cycle time, number of days a vehicle is in the shop, utilizing information input by the shops on the car's drop-off and pickup dates.

106.   The competitiveness criterion analyzes the average estimate for each State Farm repair, the cost of parts, whether a vehicle is repaired or replacement parts are utilized, the number of hours required to complete repair and similar matters.  An example of a State Farm score card is included within Exhibit "2," second page.

107.   In rating an individual shop, a total score of 1000 is possible. However, State Farm is under no obligation to disclose the weight or total number of points possible given to each factor included in reaching the score, particularly those factors included under the competitiveness criterion. In fact, State Farm has refused to disclose its method of determining competitiveness even to its own team leaders.

108.   Due to this opacity, State Farm maintains complete and unsupervised authority to determine an individual shop's rating. It is therefore possible for a shop to have no customer

complaints, high customer satisfaction, no issues identified on an audit, complete compliance with all repair cycle time and efficiency requirements and yet still have a low rating. It is also possible for a shop to have multiple customer complaints, poor customer satisfaction, numerous issues identified on audit and complete failure to meet efficiency expectations and yet have a very high rating.

109.    The Dashboard rating is very important as a shop's rating determines its position on the list of preferred providers. When a customer logs on to the State Farm web site seeking a repair shop, those shops with the highest ratings are displayed first. A shop with a low rating will be at the bottom of the list, often pages and pages down, making it difficult for a potential customer to find it. If a customer calls State Farm, the representative provides the preferred shops beginning with those holding the highest rating.

## Suppression of Labor Rates

110.    Among the questions asked by the "survey" is the individual shop's hourly labor rate. This information is supposed to be provided by the shop and to accurately reflect that shop's labor rate to allow State Farm to reach a "market rate." The actual method of determining a "market rate" is described above.

111.    If the labor rate information received is unilaterally deemed unacceptable by State Farm, a State Farm representative will contact the shop and demand the labor rate be lowered to an amount State Farm wishes to pay.

112.    If the body shop advises a labor rate increase is required, State Farm representatives will inform the body shop they are the only shop in the area who has raised its rates, therefore the higher rate does not conform with the "market rate" and is thus a violation of the direct repair program agreement.

113.    At various points in time, State Farm has utilized this method of depressing labor rates, telling each shop they are the only one to demand a higher labor rate when, in fact, multiple shops have attempted to raise their labor rates and advised State Farm of such.

114.    Should a shop persist in its efforts to raise its labor rate, State Farm will take one or more of several "corrective" measures: it will go into the individual shop's survey responses and alter the labor rate listed without the knowledge or consent of the shop and use this lowered rate to justify its determination of the "market rate." It will threaten to remove the shop from the direct repair program to coerce compliance.  It will remove the shop from the direct repair program.

115.    The net effect of this tactic is to allow State Farm to manipulate the "market rate" and artificially suppress the labor rate for the relevant geographic area, an area which, again, is defined solely by State Farm and is not subject to either neutral verification or even disclosure.

116.    The remaining Defendants, intentionally and by agreement and/or conscious parallel behavior, specifically advised the Plaintiffs they will pay no more than State Farm pays for labor.  These Defendants have not conducted any surveys of their own in which the Plaintiffs have participated to determine market rates.  These Defendants have agreed to join forces with State Farm, the dominant market holder, and each other to coerce the Plaintiffs into accepting the artificially created less-than-market labor rates through intimidation and threats to the Plaintiff's financial ability to remain operating.

### Suppression of Repair and Material Costs

117.    Through various methods, the Defendants have, independently and in concert, instituted numerous methods of coercing the Plaintiffs into accepting less than actual and/or market costs for materials and supplies expended in completing repairs.

118.     Some of these methods include but are not limited to: refusal to compensate the shops for replacement parts when repair is possible though strongly not recommended based upon the shop's professional opinion; utilizing used and/or recycled parts rather than new parts, even when new parts are available and a new part would be the best and highest quality repair to the vehicle; requiring discounts and/or concessions be provided, even when doing so requires the shop to operate at a loss; de facto compulsory utilization of parts procurement programs.

119.     In addition to the above, the Defendants have repeatedly and intentionally failed to abide by industry standards for auto repairs. Three leading collision repair estimating databases are in ordinary usage within the auto body collision repair industry:

a)     ADP;

b)     CCC; and

c)     Mitchell.

120.     These databases provide software and average costs associated with particularized types of repairs to create estimates.  The estimates generated by these databases include the ordinary and customary repairs, repair time (labor) and materials necessary to return a vehicle to its pre-accident condition.  These databases and the estimates they generate are accepted within the industry as reliable starting points, subject to the shop's expert opinions and the necessarily present variability between the "best-case scenario" presented by the procedure databases and the actual needs of a particular repair.

121.     Over the course of years, the Defendants have admitted the accepted position of the estimating databases within the industry, but have nonetheless engaged in a course of conduct of refusing to make full payment for procedures and materials. In many instances the

Defendants will refuse to allow the body shop to perform required procedures and processes, thereby requiring the Plaintiffs to perform less-than-quality work or suffer a financial loss.

122.    A non-exhaustive list of procedures and processes the Defendants refuse to pay and/or pay in full is attached hereto as Exhibit "3."

123.    At the same time, Defendants selectively rely upon and assert the definitive nature of these databases when doing so is to their respective financial advantage.  For example, when a particular repair requires twenty hours of labor to complete but the database estimate notes fifteen hours of labor is standard for that type of repair, Defendant will cite the database estimate and pay for only fifteen hours of labor time.

124.    With respect to materials, while it is inarguable that materials must be expended to repair automobile collisions, the Defendants simply refuse to pay for them, asserting materials are part of the cost of doing business.  This is the Defendants' position even when the authoritative databases specifically state that such materials are not included in the repair procedure pages.

125.    The only partial exception to this practice is paint.  While paint costs are factored into the amount the Defendants will pay, it is calculated via a formula which compensates the shops for only half the actual cost on average.  The Defendants' method of calculating paint payment does not take into account the type of paint needed/used, the requirement that paint be mixed to match the existing color of the vehicle, the actual amount of paint required to complete the job, the type of vehicle involved or any other factor.  Defendants pay only based upon arbitrary caps, self-established and unrelated to actual costs to the Plaintiffs.

126.    This continued refusal and/or failure to compensate Plaintiffs for ordinary and customary repairs and materials costs places Plaintiffs in the untenable position of either

performing incomplete and/or substandard repairs and thus breaching their obligation to automobile owners to return vehicles to pre-accident condition, or performing labor and expending materials without proper compensation and thereby jeopardizing continuing viability of the business enterprise.

127.   Defendant State Farm also imposes restrictions upon the Plaintiffs' ability to obtain and utilize quality replacement parts and materials.  As part of its DRP agreement, State Farm asserts it has the unilateral authority to enter into separate agreements with manufacturers, distributors or suppliers of automotive parts, supplies or materials.

128.   Despite the fact that the shops have no involvement in the negotiation of those separate agreements, they are de facto required to abide by the pricing agreements reached, even if they do not make purchases with those vendors.  Although presented as an option to participate, the optional language is rendered nugatory by additional language which requires the shops to accept as payment only that amount for which the parts and/or materials could have been obtained through those agreements.  Participation or lack thereof is therefore completely meaningless and the optional language is illusory.

129.   Moreover, shops are required to "stack" this purportedly optional usage of separate agreements with other discounts required elsewhere within the agreement.  Thus, the limitation on payment, refusal to compensate for nearly all materials and the compelled discounts end in a shop operating at or near a loss for each repair.

130.   Though led by State Farm as the dominant market share holder, all Defendants have agreed to and/or consciously parallel the compensation ceilings established by State Farm solely for their own profit.

**Steering**

131.    The Defendants regularly and routinely engage in "steering" in order to punish noncompliant shops. Pennsylvania law prohibits automobile insurance companies from requiring consumers to use particular body shops to effect repairs. In order to avoid facially violating this law, the Defendants will "steer" insureds and/or claimants to favored, compliant shops through misrepresentation, insinuation, and casting aspersions upon the business integrity and quality of disfavored repair centers after those centers have been identified as the shop of choice by the insured or claimant.

132.    Examples of this practice include: advising that a particular chosen shop is not on the preferred provider list; advising that quality issues have arisen with that particular shop; advising that complaints have been received about that particular shop from other consumers; advising that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer; advising that repairs at the disfavored shop will take much longer than at other, preferred shops; advising the consumer will be responsible for rental car fees beyond a certain date or if the rental vehicle is not acquired from a specific rental service provider; advising that the shop presents a "hostile environment;" claiming that the insurer and the appraisers it utilizes are not permitted on the shop premises; and that the Defendant cannot guarantee the work of that shop as it can at other shops.

133.    These statements have been made about certain Plaintiffs without any attempt to ascertain the truth thereof. Not only that, some of the ills recited which implicitly criticize the shops are wholly attributable to the insurer itself.  For instance, the statement that repairs will take longer at a disfavored shop–consumers are not told that the delay in beginning repairs is due to the insurer's decision to delay sending an appraiser to evaluate the damage, a decision completely and wholly within the control of the Defendants.  Asserting the shop charges more is

often not a function of what the shop actually charges but the Defendants' refusal to pay, also a factor wholly and completely within the control of the respective Defendant. Yet both are conveyed to the public as problems with the shop.

134.    The most egregious of these statements, that the Defendant cannot guarantee the work of the shop, is particularly misleading as <u>none</u> of the Defendants offer a guarantee for repair work. Instead, the Defendants require the body shops to provide a limited lifetime guarantee on work performed. In the event additional work is required, the body shop is required to do so without any additional payment, or to indemnify the insurer for costs if work is performed at another shop.

135.    Thus, while it may be a facially truthful statement that an insurer cannot guarantee the work of a particular shop, the clearly understood inference is that it can and will guarantee the work of another, favored shop, which is simply not true.

### Intentional Nature of Defendants' Conduct

136.    In 1963, a consent decree was entered in *United States vs. Association of Casualty and Surety Companies*, et al, Docket No. 3106, upon complaint filed in the Southern District of New York. The allegations of that complaint included violations of Sections 1 and 3 of the Sherman Act, also known as the Sherman Antitrust Act. A copy of this Decree is attached hereto as Exhibit "4."

137.    Specific actions supporting those allegations included: (1) requiring repair rather than replacement of damaged parts; (2) replacing damaged parts with used rather than new parts; (3) obtaining discounts on new replacement parts; (4) establishing strict labor time allowances; (5) suppressing the hourly labor rate; (6) channeling auto repairs to those repair shops which would abide by the insurer estimates and boycotting those which refused. The complaint further

alleged a conspiracy and combination in unreasonable restraint of trade and commerce for these practices.

138.   The Consent Decree order provided the following relief: (1) enjoined the defendants from placing into effect any plan, program or practice which has the purpose or effect of (a) directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any independent or dealer franchised automotive repair shop with respect to the repair of damage to automobile vehicles; (2) exercising any control over the activities of any appraiser of damages to automotive vehicles; (3) fixing, establishing, maintaining or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automotive vehicles or for replacement parts or labor in connection therewith, whether by coercion, boycott or intimidation or by the use of flat rate or parts manuals or otherwise.

139.   Whether or not any current Defendant is legally bound by this Decree, the actions described in the present cause fall squarely within those prohibited by the Decree.  The Decree has been "on the books" for fifty years and is well-known within the insurance industry.

140.   Being known, it can only be said that Defendants were fully aware their actions, plans, programs, and combinations and/or conspiracy to effectuate the same have been willful, intentional and conducted with complete and reckless disregard for the rights of the Plaintiffs.

## CLAIMS FOR RELIEF

### COUNT ONE: DEFENDANTS HAVE BREACHED THEIR STATUTORY OBLIGATION

141.   Pennsylvania law requires that appraisals be written for an amount for which it may be reasonably expected the damage can be satisfactorily repaired. See 31 Pa. Code § 146.8. The insurer is permitted to provide to the claimant the names of two or more conveniently

located repair shops upon the claimant's unsolicited request (31 Pa. Code § 164.8(d)); however, "No appraiser or his employer shall require that repairs be made in any specified shop." See 63 P.S. § 861(d).

142.    Through intimidation, coercion, collusion, boycotts and simple flat refusal, the Defendants have breached their respective statutory obligations. Specifically, the Defendants have failed to provide the necessary, proper and fair repairs through:

(A)    refusal to pay and/or fully pay for necessary and required procedures and processes to return a vehicle to its pre-accident condition;

(B)    utilizing used and/or recycled parts in contravention of the repair shops' expert professional opinion in order to save money and thereby compromising the safety of both the driver and passengers as well as all other members of the traveling public;

(C)    requiring shops to purchase replacement parts of unknown manufacture, reliability, and/or quality merely because it is the least expensive option.

143.    The Defendants' repeated and ongoing breaches of the statute have caused financial harm to the Plaintiffs, exposed the Plaintiffs to potential liability for damages and/or injuries resulting from failure of improper replacement parts, failure to replace rather than repair parts when appropriate, and failure of poor quality parts of unknown or uncertain provenance.


## COUNT TWO:  QUANTUM MERUIT

144.    Quantum meruit rests upon the equitable principle that a party is not allowed to enrich itself at the expense of another. More specifically, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefore.

145.   Plaintiffs have performed valuable services and expended material resources with the reasonable expectation of payment/compensation for those services and materials. This is their business. Performing said services and expending material resources benefitted Defendants and Defendant's insured/claimants for whom Defendants are required to provide payment for repairs.

146.   It was and has always been foreseeable the Plaintiffs were not performing labor or providing services and materials without expectation of full payment. However, Defendants have simply taken the position that payment may not be made unless they choose to provide it, regardless of any other factor or consideration and have thus enriched themselves at the expense of Plaintiffs.

147.   Plaintiffs are equitably entitled to receive payment for the materials and services rendered.

## COUNT THREE:   UNJUST ENRICHMENT

148.   A quasi-contract, or constructive contract, is based on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In this respect, the terms "unjust enrichment" and "restitution" are modern designations for the doctrine of "quasi-contracts" and the basis for an action for unjust enrichment lies in a promise, which is implied in law, that one will pay to the person entitled thereto which in equity and good conscience is his.

149.   It is an obligation created by law, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money under circumstances that in equity and good conscience ought not be retained and which in justice and fairness belongs to another.

150.    In the present case, Defendants' insureds and claimants entrusted the Plaintiffs with the full and complete repair of their vehicles, the cost of which it is incumbent upon the Defendants to pay. Statute requires the Defendant pay for the proper and fair repair of those vehicles. An obligation was thus created to provide payment to Plaintiffs for their work and expended materials.

151.    By failing to make payment and\or full payment for the necessary and reasonable costs of repair, Defendants have obtained or retained money which, in equity and good conscience, rightfully belongs to the Plaintiffs.

## COUNT FOUR:   ESTOPPEL/QUASI-ESTOPPEL

152.    Quasi-estoppel is an equitable principle. This long-standing doctrine is applied to preclude contradictory positions by preventing a person from asserting to another's disadvantage, a right inconsistent with the position previously taken.

153.    The Defendants have relied upon and asserted the validity\authority of the databases, supra, when it has been to their respective advantage. Indeed, State Farm has admitted the baseline applicability of the various databases and given every indication to Plaintiffs that it would comply with the minimum requirements of the databases.  Despite this, State Farm and the other Defendants have refused to compensate and/or fully compensate Plaintiffs for materials expended and work performed, including labor and labor rates, upon reliance of these very same guides, claiming they are unnecessary to complete the work at hand.

154.    Defendants' inconsistent and contradictory application of, or refusal to abide by, the guidelines of the industry databases has created an atmosphere of doubt, uncertainty and distrust, all to the severe detriment of Plaintiffs while, at the same time, seeking to obtain every improper advantage for Defendants themselves.

155.   Plaintiffs therefore seek to have the Defendants estopped from denying the applicability and reasonableness of the baseline procedures and costs set forth in the industry databases henceforth and make full payment for the necessary reasonable costs of repairs made for the benefit of Defendants' insureds and claimants.

## COUNT FIVE:   TORTIOUS INTERFERENCE WITH PROSPECTIVE OR EXISTING BUSINESS RELATIONS

156.   Tortious interference with business relations occurs when: there is a contractual or prospective contractual relationship between the complainant and a third party; there is purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; there is an absence of privilege or justification on the part of the defendant; and the complainant suffers actual legal damage as a result of the defendant's conduct. See *Skiff re Business, Inc. v. Buckingham Ridgeview, LP*, 991 A.2d 956 (Pa. Super., 2010).

157.   The Defendants have repeatedly engaged in malicious actions and a course of conduct designed to interfere with and injure the Plaintiffs' business relations and prospective business relations. The Defendants have repeatedly steered and attempted to steer customers away from the Plaintiffs' respective businesses through their repeated campaign of misrepresentation of facts, failure to verify facts damaging or tending to cause damage to the Plaintiffs business reputations before conveying the same to members of the public, implications of poor quality work, poor quality efficiency, poor business ethics and practices, and unreliability.

158 .   The purpose of these actions was twofold: to punish the Plaintiffs who complained about or refused to submit to the various oppressive and unilateral price ceilings the Defendants were enforcing upon them, and to direct potential customers of the Plaintiffs to other

vendors who would comply with the maximum price ceilings unilaterally imposed by the Defendants.

159. The Plaintiffs have been damaged by the Defendants malicious and intentional actions. Plaintiffs are therefore entitled to compensation for these damages.

## COUNT SIX: CONVERSION

160. Plaintiffs have performed necessary work and expended appropriate labor and materials for which Defendants have refused to make payment and\or full payment, even after demand for same.

161. Defendants' actions constitute a conversion of Plaintiffs' monies.

162. Defendants are therefore wrongfully in possession of monies which should have been expended to pay repair bills of their policyholders and claimants and which rightfully belongs to Plaintiff as a result plaintiffs performing necessary, reasonable and customary repairs to vehicles.

## COUNT SEVEN: VIOLATIONS OF THE SHERMAN ACT–PRICE-FIXING

163. The Sherman Act prohibits contracts, combinations or conspiracies in restraint of trade. 15 U.S.C. §1. Such agreements are illegal if (1) their purpose or effect is to create an unreasonable restraint of trade, or (2) they constitute a per se violation of the statute.

164. Through parallel actions, and\or explicit agreement, the Defendants have formed and engaged in a vertical conspiracy or combination to impose maximum price limits upon the Plaintiffs for their products and services.

165. The United States Supreme Court has noted that agreements to fix maximum prices, no less than those to fix minimum prices, cripple the freedom of traders and thereby

restrain their ability to sell in accordance with their own judgment. *Kiefer-Stewart Co.* Vs. *Joseph E. Seagram and Sons, Inc.*, 340 U.S. 211 (1951).

166.    The Defendants and co–conspirators have engaged in combination and conspiracy in unreasonable restraint of trade and commerce in the automobile damage repair industry.

167.    The aforesaid combination and/or conspiracy has consisted of a continuing agreement in concert of action among the Defendants and co-conspirators to control and suppress automobile damage repair costs, automobile material repair costs through coercion and intimidation of these shops.

168.    Evidence of this conspiracy or combination include, but is not limited to, admission before witnesses that members of the insurance industry meet regularly to discuss such matters in and amongst themselves but refuse to allow members of the auto collision repair industry to attend those meetings, explicit statements by Defendants that they will conform to State Farm's unilaterally imposed and unpublished payment structure, admitting the baseline application of the industry database but failing to conform to that minimum standard, followed by the uniformity of action by all Defendants.

169.    The aforesaid offenses have had, among others, the effect of eliminating competition within the automobile damage repair industry, elimination of some shops from a substantial segment of the automobile damage repair industry for refusing or attempting to refuse the Defendants' arbitrary price ceilings, and subjecting repair shops to collective control and supervision of prices by the Defendants and co-conspirators.

170.    Neither the Plaintiffs, nor other members of the auto collision repair industry, are able to engage in competitive business practices as the Defendants have effectively and explicitly determined what their business practices will be.

171.   The Defendants actions individually and certainly collectively have violated federal law and directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief herein prayed for is granted.

## COUNT EIGHT: VIOLATION OF THE SHERMAN ACT–BOYCOTT

172.   The United States Supreme Court has repeatedly held that boycotts constitute a violation of the Sherman Act, 15 U. S. C. §1. "Boycott" has been defined within the antitrust law context as "pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978).

173.   The Defendants have engaged, and continue to engage, in boycott and boycotting activity through their repeated actions of steering customers away from the Plaintiffs through allegations and intimations of poor quality work, of poor efficiency in performing work, of questionable business practices, of overcharging, impugning integrity, and similar actions so as to withhold and\or enlist others to withhold patronage from the Plaintiffs.

174.   This boycott was specifically designed to pressure, intimidate, and/or coerce the Plaintiffs into complying with the maximum-price limitations unilaterally conceived by Defendant State Farm and agreed to collusively by the other Defendants.

175.   It is irrelevant for purposes of the Sherman antitrust boycott activity that the Plaintiffs and Defendants are not direct competitors within the same industry. The United States Supreme Court has directly addressed this issue in *St. Paul Fire and Marine Insurance Company*, supra, stating, "[B]oycotters and the ultimate target need not be in a competitive relationship with each other." 438 U.S. at 543.

176.   The enlistment of third parties as a means of compelling capitulation by the boycotted group has long been viewed as conduct supporting a finding of unlawful boycott. *Id.*

177.   In the present matter, the Defendants have engaged in not only a boycott, but have regularly, routinely and purposefully enlisted the aid of unwitting third parties in carrying out their boycott through their intentional acts of steering those customers away from the Plaintiffs.

178.   Defendants' boycott was created and carried out with the sole purpose and intent of financially coercing and threatening the Plaintiffs into complying with the Defendants price caps.

179.   The Defendants actions are violation of federal law and have directly caused the Plaintiffs to incur substantial damages. Defendants are continuing and will continue said offenses unless the relief requested herein is granted.

## PRAYER FOR RELIEF

180.   As a result of the Defendants' actions, Plaintiffs have been substantially harmed and will continue to suffer unless the relief requested herein is granted.  The Plaintiffs therefore pray for the following relief:

A.   Compensatory damages for all non-payment and underpayment for work completed on behalf of the Defendants' insureds and claimants as determined by a jury.

B.   Compensation for the lost revenue through artificial suppression of labor rates as determined by a jury.

C.   Damages sufficient to compensate Plaintiffs for lost business opportunities as determined by a jury.

D.   Treble damages, reasonable attorneys' fees and costs  for violations of the Sherman Act, as required under 15 U.S.C. § 15.

E.   Injunctive relief prohibiting the Defendants from further engaging in any of the following:

(1)    Placing into effect any plan, program or practice which has the purpose or effect of:

        (a)    directing, advising or otherwise suggesting that any person or firm do business or refuse to do business with any Plaintiff automotive repair shop with respect to the repair of damage to automobiles.

        (b)    fixing, establishing or otherwise controlling the prices to be charged by independent or dealer franchised automotive repair shops for the repair of damage to automobiles or for replacement parts or labor in connection therewith whether by coercion, boycott or intimidation, or by the use of flat rate or parts manuals or otherwise.

(2)    Placing into effect any plan, program or practice which explicitly requires or has the purpose or effect of requiring Plaintiffs to participate in any parts procurement program.

(3)    Providing untruthful and/or unverified information to customers or third persons regarding the quality, cost, efficiency or reputation of any Plaintiff ("steering").

(4)    Prohibiting Defendant State Farm from altering or amending any Plaintiff response to its market labor rate "survey" without the express written permission of the affected Plaintiff.

F.    Punitive and/or exemplary damages sufficient to punish Defendants for their intentional acts and deter each Defendant and similar entities from pursuing this improper conduct in the future.

G.    Pre- and post-judgment interest.

H.    Any additional relief the Court deems just and appropriate.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand a judgment against Defendants in an amount sufficient to fully compensate Plaintiff for damages incurred as a result of Defendant's conduct with appropriate pre- and post-judgment interest, equitable relief as set forth above, punitive damages, attorneys' fees, expenses, costs and any other relief the Court deems the Plaintiffs entitled.

Respectfully submitted, this the _31st_ day of _October_ 2014.

Respectfully submitted,

Sullivan, Forr, Stokan, Huff, Kormanski & Naugle

By:_____

James R. Huff II, Esquire
Attorneys for Plaintiffs
1701 Fifth Avenue
Altoona, PA  16602
(814) 946-4316
PA Bar ID No. 33270